IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| LAVETTE MATHIS, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 12-858-GMS |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM

## I. INTRODUCTION

Lavette Mathis ("Mathis") applied for Title II and XVI, 42 U.S.C. §§ 401–433, disability insurance benefits ("DIB") and supplemental security income ("SSI") on June 17, 2009, claiming that she was unable to work due to her disability beginning on January 1, 2006. Her applications were denied on October 30, 2009, and again upon reconsideration on January 11, 2010. Mathis then timely filed a request for an administrative hearing on February 3, 2010. A video hearing took place on October 22, 2010, before Administrative Law Judge ("ALJ") Judith A. Showalter. ALJ Showalter rendered a written decision on December 3, 2010, denying Mathis' request for benefits. The Appeals Council denied Mathis's request for review on May 30, 2012. Having exhausted her administrative remedies, she filed a complaint with the court on July 9, 2012. (D.I. 1.) The Commissioner of Social Security Administration (the "Commissioner") timely answered on August 30, 2012. (D.I. 3.) Mathis moved for summary judgment on December 10, 2012, (D.I. 9), and the Commissioner filed a cross motion for summary judgment on February 11, 2013. (D.I. 12.) Because the court finds that the ALJ's denial of benefits was supported by substantial

evidence, the court will deny Mathis's motion and grant summary judgment in favor of the Commissioner.

## II.     BACKGROUND

Mathis suffers from depression, diabetes, heart disease, and schizoaffective disorder. (D.I. 5 at 18–20.) Her depression, schizoaffective disorder, and heart condition constitute a "mild" impairment of her ability to work. (*Id.*) Mathis was consistently employed from 1999 until 2009. At first she performed menial labor and later worked as a teaching assistant. In May 2002, Mathis became a Certified Nursing Assistant. (*Id.* at 42.) From 2003 to 2005, Mathis worked for Generations Home Care. In 2005, she began working for the Delaware hospice and the Franciscan Elder Care. (*Id.*) From 2007 to 2008, Mathis worked for Molter Associates. (*Id.*) Then beginning in 2009, Mathis worked for St. Francis Hospital. (*Id.*) At the time of the administrative hearing, Mathis claimed she quit her job due to stress on her heart from lifting patients. (D.I. 5 at 41, 174.) The record, however, indicates that Mathis was fired from her job in May 2009 for stealing patients' credit cards, several weeks before the alleged onset of her disability. (*Id.* at 24.)

### A.     Medical History

Mathis is requesting a closed period of benefits from June 8, 2009, through June 8, 2010. (D.I. 5 at 15.) Although Mathis claims her mental illness emerged in 2005, she remained gainfully employed until May 2009, when, as already noted, she was fired for stealing clients' credit cards. Mathis'closed period ends at the beginning of her incarceration for a failed drug test while on probation for stealing those credit cards. (*Id.* at 39.)

On April 20, 2009, Mathis first received care from Dr. David Kalkstein, a psychiatrist, and Sue Getty Evans, a therapist and social worker. (*Id.* at 239.) At the first meeting, Dr. Kalkstein

2

diagnosed Mathis with Major Depressive Disorder and assessed her to have a GAF score of 50.[1] (*Id.* at 277.) In evaluations on July 8, 2009, and July 22, 2009, Dr. Kalkstein diagnosed Mathis with schizoaffective disorder after Mathis complained of hearing voices in her head, a condition which allegedly first began in 2005. (*Id.* at 276.) In addition to auditory hallucinations, Mathis complained of mood swings and panic attacks, although on July 8 she admitted her mood had been improving. (*Id.*) On August 5, 2009, she reported to Dr. Kalkstein that she was feeling better at times and was "taking care of [her] kids and [her] house." (*Id.* at 275.)

On September 16, 2009, Mathis informed Dr. Kalkstein that, although her mood was improving, she had begun to experience increased anxiety. (*Id.* at 302.) On the same day Mathis met with her general practitioner Dr. Beverly Toporowski; during the meeting Mathis reported to Dr. Toporowski that she was seeing a psychiatrist every week to deal with her psychological issues, that the Risperdal prescribed for her auditory hallucinations was working, and that she was "feeling much better." (*Id.* at 353.)

On September 23, 2009, Dr. Christopher King, a state agency psychological expert, reviewed Mathis' file and concluded that she was capable of performing simple tasks and sustaining a basic work routine, despite having moderate limitations in her ability to understand, remember, and carry out detailed instructions, as well as having moderate limitations in her ability to maintain concentration for prolonged periods of time. (*Id.* at 280–91). Further, Dr. King concluded that Mathis was only partially credible about her condition, with her actual mental

---

[1] GAF stands for "Global Assessment of Functioning"; it is a statistical tool used by healthcare providers to measure a person's ability to function. The scale ranges from 1–100, in increasing ability to function. A score of 50 falls on the border of moderate to serious impairment of functioning. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) [hereinafter "DSM-IV-TR"].

3

limitations much less severe than her stated limitations. (*Id.*) Dr. King found it dubious that Mathis' acute symptoms coincidentally appeared just after she had been fired from her last job and that she reported new symptoms of auditory hallucinations after beginning a regimen of psychotropic medications. (*Id.*) Dr. King determined that Mathis suffered from mild underlying depressive anxiety, rather than a chronic, debilitating illness. (*Id.*) Dr. King found that other treating sources had overestimated the severity of her illness and that her current complaints were "situational," a function of her recent criminal behavior. (*Id.*)

On September 30, 2009, Dr. Toporowski reviewed Mathis' mental status, noting that she would begin treatment for her depression at Meadow Wood Hospital the next day. (*Id.* at 351.) On October 1, 2009, she was admitted into the partial hospitalization program at Meadow Wood, where she remained until October 12, 2009. (*Id.* at 306.) Upon admittance, Meadow Wood medical staff conducted a mental status examination that revealed that the Mathis's memory was intact, her general appearance was "neat/well-groomed," she displayed a depressed and anxious mood, and presented a flat affect, with a GAF score of 45.[2] (*Id.* at 308, 313.) Twelve days later, Dr. Mujib O'Beidy discharged Mathis, diagnosing the patient with major depressive disorder, recurrent and severe psychosis, and cannabis dependence. (*Id.* at 310.) Dr. O'Beidy assessed Mathis with a GAF score of 65.[3] (*Id.*)

On October 13, 2009, the day of Mathis' release from the Meadow Wood facilities, she reported to Dr. Kalkstein that she now only experienced hallucinations for a few seconds at a time

---

[2] A score of 45 indicates serious symptoms or serious impairment in social, occupational, or school functioning, consistent with the inability to keep a job. *See* DSM-IV-TR at 34.

[3] A score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) *or* some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *See* DSM-IV-TR at 34.

and was overall doing better. (*Id.* at 302.) On October 17, 2009, Mathis saw Dr. Toporowski, complaining that her psychotropic medications made her feel off-balance, dizzy, and sleepy. (*Id.* at 346.) On October 20, 2009, Mathis admitted to Dr. Kalkstein that she was taking more Xanax than she had been prescribed. (*Id.* at 302.) Then on October 27, 2009, Mathis reported to Dr. Kalkstein that her auditory hallucinations had improved with her use of Risperdal. (*Id.* at 301.) On November 10, 2009, Mathis reported to Dr. Kalkstein that the auditory hallucinations had subsided. (*Id.*) Throughout November and December, Mathis was instructed to restart group therapy after reporting that she continued to experience anxiety, sadness, lack of appetite, and inadequate sleep. (*Id.*)

On January 11, 2010, Dr. Carlene Tucker-Okine, another state psychological expert, reviewed Dr. King's evaluation and affirmed his findings that Mathis had exaggerated the extent of her incapacity. (*Id.* at 322–35) Throughout early 2010, leading up to the Mathis' eventual arrest for her use of PCP, she reported a deteriorated mental state. (*Id.* at 356.)

On April 13, 2010, Dr. Kalkstein and Ms. Evans determined that Mathis' current GAF score was 33 as part of their Mental Impairment Questionnaire ("MIQ").[4] (*Id.* at 239.) The MIQ further stated (incorrectly) that the highest GAF Mathis had presented in the past was 40, and also stated that she had responded poorly to treatment in the past year. (*Id.*) The evaluators concluded that Mathis had been severely impaired for the past year, with "no useful ability" in most mental functioning categories. (*Id.* at 240.)

---

[4] A score of 33 corresponds to: "Some impairment in reality testing or communication . . . *or* major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *See* DSM-IV-TR at 34.

5

During much of the year Mathis claims she was disabled, she was, at the same time, using illicit drugs. As the ALJ noted: "If I find that you are disabled and that you have a substance disorder (drug, alcohol, or both), I also will decide whether it is a contributing factor material to the determination of disability. This means I will decide whether you would be disabled if you were not using drugs or alcohol. If drug addiction or alcoholism is a contributing factor material to the determination of your disability, I will not find you disabled." (*Id.* at 113.)

B. **Mental Residual Functional Capacity ("RFC") Assessments**

1. **The MIQ of Dr. Kalkstein and Sue Evans.**

Dr. Kalkstein and Ms. Evans's MIQ stated that Mathis was severely impaired and was incapable of work. (D.I 5 at 239–44.) They assessed Mathis with a GAF of 33 during the period for which she was using PCP, while wrongly claiming that her highest GAF in the last twelve months was 40; in reality, Dr. O'Beidy had assessed the Mathis a GAF score of 65 while she resided at Meadow Wood. (*Id.* at 239, 310.) The MIQ noted that Mathis had recurrent obsessions and compulsions, such as her history of excessive shopping, and emotional withdrawal or isolation. (*Id.* at 240). In addition, the MIQ noted that Mathis was "too impaired by mental illness to minimally take care of herself and [her] kids, [as a result of her] depression and anxiety symptoms in addition to the voices [she hears] all day long." (*Id.* at 251.) Thus, Ms. Evans and Dr. Kalkstein found that the Mathis was incapable of work during the contested period.

2. **Dr. King**

Dr. King found that Mathis's claims of severe mental disability were questionable. (*Id.* at 280.) In particular, Dr. King found:

6

> [H]er allegations are suspect, and her claims are not clearly consistent with the psychotic process. While she does appear to have underlying depressive and anxiety symptoms, she does not appear to have a chronic debilitating condition (as her current complaints are either situational in nature or more a function of her recent criminal behavior and related legal involvement).

(*Id.*) Further, Dr. King notes that Mathis's "social functioning is adequate, and while she may have moderate limitations in CPP [cognitive process profile], she retains the mental RFC for simple tasks." (*Id.*) Overall, Dr. King found that Mathis can occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk two hours in an eight-hour workday, sit for six hours in an eight-hour workday, and has unlimited push and pull capabilities. (*Id.* at 293.)

### 3. Dr. Tucker-Okine

Dr. Tucker-Okine was charged with reviewing Dr. King's finding. (*Id.* at 333–35.) Dr. Tucker-Okine affirmed all of Dr. King's findings without any further notes. (*Id.*)

### 4. Friend's Testimony

Sherea Armstead, a friend of Mathis, submitted a third-party functioning report on Mathis's capabilities. (*Id.* at 186–93.) Ms. Armstead noted that she "live[d] with Lavette [Mathis] for eleven years" and assisted Mathis both with her children and with her depression. (*Id* at 193.) Ms. Armstead appears to make the claim that Mathis was forced to quit her job because of her depression, but as already noted, she was fired from her job for stealing credit cards from clients. (*Id.* at 193, 280.)

### 5. Vocational Expert Testimony

Adina Leviton, a vocational expert ("VE"), testified at Mathis' hearing. (*Id.* at 64–68). ALJ Showalter asked Leviton:

> [C]onsider a hypothetical person who is approximately the claimant's stated age at onset . . . . Has a high school education. Is able to read and write and do simple math, add, subtract. There are certain underlying impairments that place limitations on the ability to do work-related activities. Let's start with a light level of exertion . . . . But no climbing of a ladder, rope, or a scaffold. . . . Additionally, non-exertional limitations would limit [Mathis] to simple, unskilled work. Work that . . . would not [be] at a production pace, that means paid by the piece. Or working at an assembly line. Now, with those limitations, would such a person be able to do any of the claimant's past relevant work in your opinion?

(*Id.* at 65–66.) In response, Leviton responded that the hypothetical person could not engage in a high-intensity work. (*Id.*) ALJ Showalter then asked if there was "any simple, unskilled work such a person could do in the regional or national economy that would fit within the parameters of the hypothetical?" (*Id.*) Leviton responded with positions that could accommodate Mathis's limitations: office helper (170,000 nationally; 1,000 locally), counter clerk (61,000 nationally; 1,000 locally), addresser (30,000 nationally; 300 locally), order clerk for food and beverage (20,000 nationally; 500 locally), and taper for printed circuit boards (56,000 nationally; 300 locally). (*Id.* at 66–67.) Upon cross-examination, however, Leviton acknowledged that if the hypothetical individual were going to miss four days or more of work per month and suffers severe functional limitations, she would probably not be able to sustain full-time employment." (*Id.*)

D.  **ALJ's Findings**

ALJ Showalter found Mathis to have the residual functional capacity:

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for two hours, and sit for about six hours in an eight-hour work day. The claimant could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. The claimant should never climb ladders, ropes, or scaffolds.

8

(*Id.* at 20.) In addition, ALJ Showalter found that Mathis "must avoid concentrated exposure to temperature extremes, humidity, fumes, odors, dusts, gases, and hazards, defined as heights and moving machinery." (*Id.*) ALJ Showalter found that although limited in some areas, there were jobs in the national economy that Mathis could perform in her current condition. Overall, ALJ Showalter found that Mathis "can perform simple, unskilled work, not at a production pace or on an assembly line." (*Id.*)

## III. STANDARD OF REVIEW

### A. Review of an Agency Decision

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992); *see also Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, . . . [the court is] bound by those findings, even if . . . [it] would have decided the factual issue differently."). "Substantial evidence" means more than "a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The inquiry is not whether the reviewing court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).

## IV. DISCUSSION

Mathis argues that the ALJ committed error by (1) failing to accord proper deference to Mathis' treating sources, (2) failing to develop the record as it related to Mathis' mental impairments, (3) failing to adequately account for Mathis' functional limitations, and (4) failing to assess credibility of the witnesses.

### A. Applicable Statute and Law

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner has promulgated regulations for determining disability by application of a five-step sequential analysis. *See* 20 C.F.R. § 404.1520. The ALJ, the reviewing Appeals Council, and the Commissioner evaluate each case according to this five-step process until a finding of "disabled" or "not disabled" is obtained. *See id.* § 404.1520(a). The process is summarized as follows:

1. If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."

2. If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 *and* has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."

4. If the claimant can still perform work he has done in the past ("past relevant work") despite the severe impairment, he will be found "not disabled."

> 5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not he or she is capable of performing other work in the national economy. If he or she is incapable, a finding of disability will be entered. Conversely if the claimant can perform other work, he will be found "not disabled."

*Cunningham v. Apfel,* No. 00-693-GMS, 2001 WL 1568708, at *4 (D. Del. Dec. 7, 2001) (paraphrasing the five-step process for determining disability).

The disability determination analysis involves a shifting burden of proof. *See Wallace v. Secretary of Health & Human Servs.,* 722 F.2d 1150, 1153 (3d Cir. 1983). In the first four steps of the analysis, the burden is on the claimant to prove every element of his or her claim by a preponderance of the evidence. At step five, however, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment the claimant is able to perform. *See Sykes v. Apfel,* 228 F.3d 259, 263 (3d Cir. 2000); *see also Kangas v. Bowen,* 823 F.2d 775, 777 (3d Cir. 1987); *Olsen v. Schweiker,* 703 F.2d 751, 753 (3d Cir. 1983). Substantial gainful employment is defined as "work that—(a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. When determining whether substantial gainful employment is available, the ALJ is not limited to consideration of the claimant's prior work, but may also consider any other substantial gainful activity which exists in the national economy. *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A); *Heckler v. Campbell,* 461 U.S. 458, 460 (1983).

## B. ALJ Showalter Accorded an Appropriate Level of Deference to Mathis's Treating Sources

Prior to addressing whether there is substantial evidence to support ALJ Showalter's decision to accord little weight to Dr. Kalkstein and Ms. Evans' MIQ, the court must first acknowledge that ALJ Showalter made an error in describing the MIQ as prepared solely by Ms. Evans. (D.I. 5 at 25). Instead, this MIQ was signed by Dr. Kalkstein, even if the notes do not match his handwriting, and thus was endorsed by Dr. Kalkstein. (*Id.* at 238–44.) While this is certainly an error, we must inquire as to how much deference ALJ Showalter was required to give the MIQ, if any, and whether in light of the standard, ALJ Showalter had substantial evidence to give little weight to the MIQ.

According to Mathis, a treating, longitudinal source is deserving of the greatest deference. (D.I. 9 at 5–10). Mathis cites cases that emphasize the importance of treating sources in appraising the functional capabilities of the claimant. *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008). Thus, as Dr. Kalkstein was Mathis's treating physician, Mathis argues that Dr. Kalkstein's MIQ and associated findings of extreme limitations should have been granted greater weight than ALJ Showalter afforded in her ruling. (D.I. 9 at 5–10).

By contrast, the Commissioner argues that argues that Mathis misstates the requisite level of deference that must be shown to a treating source's opinion and further notes that Dr. Kalkstein and Ms. Evans' MIQ not only conflicts with other medical opinions, but conflicts with medical notes prepared by Dr. Kalkstein himself. (D.I. 13 at 17-20). As laid out in the Social Security Administration's regulation on "Evaluating Medical Opinions," ALJ Showalter was only required to give controlling weight to treating medical sources "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

12

evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Further, the level of deference to the treating source also depends on how long the doctor has been seeing the patient. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.")

Here, ALJ Showalter had substantial evidence to find that she was not required to give controlling weight to the MIQ. The ALJ is required to conduct an independent analysis of the relevant evidence and develop an appropriate RFC based upon that evidence. 20 C.F.R. §§ 404.1545, 416.945; *see also* SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996) (noting that relevant evidence includes medical history, medical signs and laboratory findings, the effects of treatment, reported activities, reported symptoms, and recorded observations, in addition to medical source statements). Although Mathis cites *Brownawell* for the proposition that a treating source must be given greater deference, she misses the general thrust of the case. In *Brownawell*, the Third Circuit objected to the ALJ's creation of evidence to contradict the doctor's consistent conclusions, recorded over a prolonged period of time. *Brownawell*, 554 F.3d 352, 355. The facts of this case are distinguishable.

Dr. Kalkstein saw Mathis twelve times during the requested disability period and it was only towards the end of the year-long period that he found her to be extremely disabled. (D.I. 5 at 239–44). In past evaluations, Dr. Kalkstein had noted that Mathis "was feeling better at times and was "taking care of [her] kids and [her] house," or was experiencing an improved mood. (*Id.* at 275, 301). Importantly, the two appointments where Dr. Kalkstein had the most negative prognoses coincide with the periods during which Mathis checked into a mental health facility for marijuana use, and the MIQ was recorded subsequent to Mathis's PCP use. (*Id.* at 239, 302).

13

As this court does not review the record *de novo*, but merely seeks to determine whether the ALJ had substantial evidence for his or her decision, Mathis' attempt to have this court reevaluate the importance of Dr. Kalkstein's MIQ must fail. *Fargnoli*, 247 F.3d at 38. The MIQ conflicts with Dr. Kalkstein's previous medical assessments and fails to take cognizance of external factors that may have contributed to Mathis' poor state. (D.I. 5 at 275–77). ALJ Showalter decision not to afford the MIQ controlling weight was supported by substantial evidence.

Moreover, ALJ Showalter appropriately weighed the evidence from Dr. King and Dr. Tucker-Okine to determine whether Mathis was disabled. *See* SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996). ("Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone.") From the doctors' evaluations, ALJ Showalter concluded that Mathis could perform simple tasks and sustain a basic work routine. She had moderate limitations only in the areas of her ability to understand and remember, and could carry out detailed instructions and maintain concentration for extended periods. (D.I. 5 at 278–79). In making his assessment, Dr. King explained that Mathis' acute symptoms "appeared coincidental with the termination from her last job" for stealing credit cards, and that she reported new symptoms of auditory hallucinations after starting psychotropic medications. (*Id.* at 280). Thus, with the incongruities in Mathis' record and testimony from other doctors, ALJ Showalter had substantial evidence to consider Dr. Kalkstein's MIQ with little weight.

### C. ALJ Showalter Sufficiently Developed the Record Pertaining to Mathis's Mental Health

Mathis alleges that ALJ Showalter failed to sufficiently develop the record relating to her schizophrenia. The court notes at the outset that much of Mathis' argument is directed toward

14

trying to convince the court that she is indeed disabled, rather than attacking the evidentiary basis for ALJ Showalter's decision. As already stated, the court's role is not to make a *de novo* determination of disability. But to the extent that Mathis does make a colorable argument, she asserts that ALJ Showalter cherry-picked her sources rather than fully representing Mathis' medical record, as required by the Third Circuit's decision in *Fargnoli*, 247 F.3d at 42. Mathis' analysis of *Fargnoli* is superficial at best. In *Fargnoli*, the ALJ took four paragraphs to cover over ten years of medical evaluations of the claimant, which the Third Circuit found insufficient to evaluate the ALJ's reasoning. *Id.* Here, the court is presented with only one year of medical treatment with widely divergent GAF scores. The records are also skewed by the effects of drug use. Further, Mathis never substantiates her claim that there are gaps in the record; she provides no evidence that her treatment records were excluded from consideration. The court finds that Mathis has failed to demonstrate that ALJ Showalter committed error.

## C. ALJ Showalter Correctly Considered Mathis' Functional Limitations

Mathis rightly points out that ALJ Showalter may not merely find that Mathis has the ability to perform unskilled work without evidence. *See* SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985) ("The decisionmaker *must not assume* that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work." (emphasis added)); *see also* SSR 85-16, 1985 WL 56855, at *1 (Jan. 1, 1985) ("Conclusions of ability to engage in [substantial gainful activity] are not to be inferred merely from the fact that the mental disorder is not of listing severity."). But based on the improvements Mathis experienced at Meadow Wood in light of several doctors' relatively positive assessments, ALJ Showalter did have substantial evidence to suggest that Mathis' condition was manageable. (D.I. 5 at 302). Further, Mathis admitted to Dr.

15

Kalkstein that she was taking too much Xanax, a known depressive drug that would partially explain the plaintiff's lack of energy. (*Id.*) The ALJ accounted for Mathis' limitations with her finding that Mathis can only perform simple, unskilled work. (*Id.* at 20). Although Mathis suggests that the ALJ was required to further expand on her specific functional findings, (D.I. 9 at 15), the ALJ's discussion of Mathis's progress reports from Dr. Kalkstein, the treatment notes from her primary care physicians, and reports from her participation in the partial hospitalization program, coupled with her finding that Mathis could perform simple, unskilled work not at a production pace or on an assembly line, fully satisfies the law, as articulated by SSR 96-8p. SSR 96-8p, 1996 WL 374184 (July 2, 1996); *see McCafferty v. Astrue*, No. 07-3641, 2008 WL 1869282, at *4 (E.D. Pa. Apr. 25, 2008) (stating that an ALJ satisfies SSR 96-8p by discussing the pertinent medical evidence and addressing the claimant's functional limitations).

### D. ALJ Showalter Properly Assessed the Testifying Parties Credibility.

Mathis' final complaints deal with ALJ Showlater's refusal to accept either Mathis' or Ms. Armstead's testimonies concerning Mathis' disabilities. Ultimately, the credibility issues come from the inconsistency of Mathis' own testimony. One such example is the plaintiff's claim that abstaining from the use of drugs did not improve her mental state. (D.I. 5 at 56). During the alleged period of disability, however, the medical records show that Mathis did unequivocally improve when she abstained from drugs, such as when she checked into the Meadow Wood medical facility. (D.I. 5 at 310). If Mathis could not accurately describe the impact of illicit drugs on her system, then ALJ Showalter's decision to discredit Mathis' testimony in general was not unreasonable. Further, Mathis attempted to make the argument that she was fired because of her mental

impairments, even though there was extensive evidence that she was fired and criminally charged for stealing her clients' credit cards. (D.I. 9 at 16).

Mathis rightly points out that ALJ Showalter erred by failing to explicitly evaluate the credibility of Ms. Armstead's testimony. *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000). The Third Circuit has found, however, that if the error was non-dispositive of the case, then remanded is not appropriate. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) ("We . . . conclude that a remand is not required here because [the error] would not affect the outcome of the case.") As already explained, ALJ Showalter had legitimate cause to question the severity Mathis' impairments and the way she portrayed her illness to others. Moreover, Ms. Armstead's RFC assessment also indicates that she was not fully apprised of all the facts.[5] For this reason, remand is not required. *Id.*

## V. CONCLUSION

ALJ Showalter's findings were supported by evidence a "reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. Thus, the court will grant the Commissioner's motion for summary judgment, and deny Mathis's motion for summary judgment.

Dated: December 1⟂, 2014

UNITED STATES DISTRICT JUDGE

---

[5] Ms. Armstead stated that Mathis was forced to quit her job because of her illness, whereas it has been established that Mathis was fired for credit card theft. Ms. Armstead's RFC assessment was also completed in two very distinct styles of handwriting, further supporting the court's view that it would not have been entitled to meaningful weight by the ALJ.

17